

# MULTIPLAN, INC.
# PARTICIPATING FACILITY AGREEMENT

THIS AGREEMENT, effective __11/01/03__, is entered into and by and between **MultiPlan, Inc.** (MPI), with principal offices located at 115 Fifth Avenue, New York, New York 10003-1004, with respect to MPI lines of business and/or with respect to Preferred Plan lines of business (hereafter referred to as Network) and _North Beach Dialysis_, with principal offices located at _16800 NW 2nd Ave, Ste 208, N. Miami Beach_ (Facility). _FL 33169_

**WHEREAS**, Network represents and is authorized by various organizations, including employers, third party administrators, insurers, and other similar entities (Clients), who issue or administer health care coverage pursuant to a benefit plan, Workers' compensation programs, automobile liability coverage, or other programs (Benefit Programs) for covered individuals (Participants) to establish a preferred provider relationship with Facility as described herein; and

**WHEREAS**, Facility wants to provide health care services in accordance with the terms of this Agreement;

**THEREFORE**, in consideration of the foregoing and of the mutual covenants, promises and undertakings herein and intending to be legally bound hereby, the parties agree as follows:

## A. DEFINITIONS

1. <u>Benefit Plan or Benefit Program</u> A contract, policy, or other document, or a Workers' Compensation or auto medical plan under which a Client is obligated to provide benefits on behalf of Participants.

2. <u>Clean Claim</u> A completed UB92 or other standard billing form providing the same information.

3. <u>Client (Payor)</u> An employer, insurance carrier, or other entity that sponsors or administers, as applicable, one or more Benefit Plan and which has contracted with Network on behalf of one or more such Benefit Plan, to enable Participants to have access to health care providers participating in Network at Contract Rates.

4. <u>Contract Rates</u> The rates of reimbursement for health care services rendered to Participants set forth in Network's agreements with Network Facilities, whether in the form of a per diem, case rate, procedure rate, negotiated rate based on published charges, or fee schedule.

5. <u>Co-insurance</u> An amount equal to a fixed percentage that the Participant is responsible for paying in accordance with the Benefit Program.

6. <u>Coordination of Benefits</u> The determination of which of two or more Benefit Programs will pay health benefits for a Participant as primary payor and which will pay as secondary payor, and/or as tertiary payor.

7. <u>Co-payment</u> An expressed dollar amount for a given Covered Service which, under the terms of the Benefit Program, is required to be paid by the Participant directly to the Facility.

8. <u>Covered Service</u> A medical service provided under the terms of this Agreement which is eligible for reimbursement under the terms of the applicable Benefit Program.

9. <u>Deductible</u> The amount a Participant is required to pay by the Benefit Program before a claim for benefits by the Participant is eligible for reimbursement by the Client.

10. <u>Participant (Eligible Person)</u> A person who is entitled to benefits and who on the date health care services are rendered has satisfied the eligibility requirements under the Client's Benefit Program.

11. <u>Quality Assurance/Management</u> An ongoing process which is approved and conducted by the Client, designed to objectively and systematically monitor and evaluate the quality and timeliness of health care services furnished by Participating Facilities to Participants and to identify and resolve problems based on established criteria.

12.   **Reasonable and Customary Charge**   The fee for a health care service which is no greater than the average and prevailing charge for the same service in the same geographic community or in a geographic community which is similar to that in which the service is rendered.

13.   **Utilization Management Program**   A process designed to review and determine, on a prospective, concurrent, and/or retrospective basis, whether the medical procedure provided to a Participant pursuant to the terms of the Benefit Program and this Agreement is a Covered Service.

**B.   RESPONSIBILITIES OF NETWORK**

1.   **Notification.**   Network agrees to notify its participating Clients that Facility is participating in the Network network, and to distribute to its Clients material made available to Network by Facility about Facility's services.

2.   **Limitations.**   Network does not determine benefits eligibility or availability for Clients' Participants and does not exercise any discretion or control as to Clients' Benefit Program assets, with respect to policy, payment, interpretation, practices, or procedures. Network is not the administrator, insurer, underwriter, or guarantor of Clients' Benefit Programs, and Network is not liable for the payment of services under Clients' Benefit Programs. Nothing in this Agreement shall be construed as interfering with the freedom of choice of eligible Participants.

3.   **Referrals.**   Network shall maintain a twenty-four hour-a-day toll-free telephone referral system for the purpose of advising Clients and Participants of providers in Network's Network. Facility shall be included in this referral system.

4.   **Grievances and Appeals.**   Network shall maintain a grievance and appeal mechanism that shall be available to Facility as a forum for the resolution of complaints and disputes pertaining to issues arising out of this Agreement including but not limited to reimbursement and quality management issues. In general, utilization management issues will be referred to the Client.

**C.   RESPONSIBILITIES OF FACILITY**

1.   **Provision of Health Care Services**   Facility solely shall be responsible for the provision of health care advice and treatment rendered, ordered, or authorized by Facility, its employees and/or agents, with respect to Participants. Such services shall be provided to Participants, including those covered by Workers' Compensation and auto liability coverage, in accordance with community standards, in the manner in which Facility renders services to other patients, and without discrimination based on sex, race, color, religion, marital status, sexual orientation, age, ancestry, or national origin.

2.   **Licensure and Certification**   Facility shall comply with all laws relating to furnishing health care services to Participants and maintain in effect all permits, licenses and governmental approvals which may from time to time be necessary for that purpose. Facility shall maintain appropriate state licensure and Medicare certification, as well as accreditation by the appropriate recognized accrediting organization. A copy of Facility's current certificate of accreditation is attached as Appendix B. Facility agrees to notify Network within thirty days of any change in compliance with any of these requirements. Facility shall notify Network of any pending investigation, action, or sanction against it, any agent and/or any employee, which may materially affect Facility's ability to perform an obligation under this Agreement, or would otherwise bear on a requirement of this paragraph.

3.   **Quality Assurance**   Facility shall cooperate with all reasonable quality assurance and utilization management programs administered by Clients or their designees, to the extent that such programs are consistent with community standards.

4.   **Insurance**   Facility shall maintain professional and general liability insurance covering Facility against claims arising out of the services to be performed hereunder each in the minimum amounts required by law or, in the absence of statutory requirements, no less than $1 million per occurrence and $3 million in the aggregate. Documentation of Facility's current insurance is attached as Appendix C. If the form of Facility's insurance is "claims made," Facility agrees that it shall purchase appropriate tail coverage for claims, demands, or actions made after termination of this Agreement in relation to acts or omissions occurring during the term of this Agreement. Facility shall provide Network with a copy of its certificate(s) of insurance. Facility shall notify Network in writing within thirty (30) days of cancellation, non-renewal, and/or any material change in such coverage.

5.  **Facility Grievance Procedures** Facility shall maintain procedures for resolving grievances and shall cooperate with any grievance procedures or programs sponsored by Network, Clients, or their designees. Facility shall notify Network promptly upon knowledge of any dispute, complaint, or grievance relating to patient care or other disputes involving Network, its Clients, their designees, or Participants. Facility may challenge a payment made by a Client as erroneous or inadequate during the six (6) months following Facility's receipt of such payment. Thereafter, such a challenge shall be null, and the payment shall be deemed proper.

6.  **Directory** Facility agrees that Network and/or Clients may use Facility's name, address, telephone number and type of services or facilities in any printed directory or other roster of participating providers.

7.  **Coordination of Benefits** Facility shall cooperate with Clients for purposes of coordinating benefits. When a Client is a primary payor, Facility shall accept from Client as payment in full for Covered Services the amounts established in Appendix A, less the appropriate deductibles, co-payments and co-insurance. When a Client is a secondary payor, Facility shall accept from Client as payment for Covered Services the difference between the amount set forth in Appendix A, and the sum of the amount paid by the primary payor(s) and the appropriate deductibles, co-payments and co-insurance.

8.  **Billing Clients** Facility may not bill a Client more than ninety (90) days after an inpatient Participant's discharge from the Facility or more than ninety (90) days after the conclusion of an outpatient Participant's course of treatment.

9.  **Billing Participants** Facility agrees to bill Participant for appropriate co-payments, deductibles, and co-insurance only in the amount of the difference between the amount due for Covered Services based on Appendix A, and the sum of the amounts paid by the Clients and any other payors. Facility shall not balance bill or attempt to collect compensation from Participants in connection with services covered by this Agreement, except as expressly permitted by law.

D.  **FINANCIAL**

1.  **Compensation**

    a.  Facility agrees to accept as payment-in-full for Covered Services rendered to Participants, the amounts due according to Appendix A. Facility guarantees that the Contract Rates Facility has extended to Network under this Agreement are lower than the prompt pay rates Facility offers to the general public and/or that are required by law. If, during the term of this Agreement, Facility enters into any other contract, agreement, or other arrangement under which Facility provides substantially the same services at a negotiated rate(s) less than that set forth in Appendix A, the lower negotiated rate shall apply to Covered Services rendered under this Agreement.

    b.  When Clients or their designees perform utilization reviews and/or bill validations, eighty percent (80%) of the amount due according to Appendix A, shall be paid by the Clients prior to any review or validation. Based on the results of the review or validation, Clients shall pay Facility the balance due, or Facility shall make a refund to Client(s) within thirty (30) business days after the date the final approved amount is determined. Clients shall not forfeit the Contract Rate when this procedure is followed.

2.  **Payment** Facility shall submit claims to Clients on a completed UB92 or other standard billing form providing the same information, and Clients must make payment to Facility within thirty (30) business days of receipt of such claim in order to obtain the benefit of the Contract Rate. Upon request, Facility shall furnish to Client or Network, all information reasonably required to verify Facility's health care services and the charges for such services.

3.  **Adjustments to Clients' Payments** Clients' payments due under this Agreement shall be reduced by any applicable deductibles, co-payments, co-insurance. Facility shall notify Client and Network of any erroneous claim sent to a Client within sixty (60) days of the date the claim was issued, and of any erroneous payment received within sixty (60) days of the date Client's payment was received.

4.  **Disputed Claims** In the event of a dispute between Facility and a Client regarding billed amounts or payment due, Client shall have the right, upon written notification to Network about the dispute within sixty (60) days of receipt of the relevant Clean Claim, to withhold payment pending resolution of the dispute. Network shall make its best efforts to assist the parties in resolving the dispute.

5.      **Audit**  Upon fifteen (15) business days' written notice, and during the audited party's regular business hours, each party shall have the right to audit the other's records pertaining to this Agreement for a period of six (6) months prior to the date of the notice of audit.

6.      **Survival**  With respect to services rendered during the term of this Agreement, the rights and obligations set forth in this Section shall survive the termination of the Agreement.

7.      **Website Hyperlink**     Facility is hereby authorized to create a hyperlink between MPI's Website (www.Network.com) and Facility's Website.  Any provision of this Agreement to the contrary notwithstanding, this authorization may be revoked by MPI if MPI gives Facility thirty days' written notice of MPI's intent to revoke the authorization, and this authorization terminates automatically upon the termination or expiration of this Agreement.

E.      **TERM AND TERMINATION**

1.      **Term**  This Agreement shall be effective for an initial term of two (2) years from the Effective Date indicated above. Thereafter, this Agreement shall automatically renew for successive one (1)-year terms.

2.      **Termination**

   a.      Either party may terminate this Agreement by giving the other party written notice of the termination at least ninety (90) days prior to the end of the term in progress.  Such termination shall be effective on the first day of the first month following the end of the term then in progress.

   b.      Either party may terminate this Agreement for cause due to a material breach by giving thirty (30) days advance written notice during which the breach may be cured.  The notice of termination for cause will not be effective if the breaching party cures the breach to the reasonable satisfaction of the other party within the thirty-day notice period.

   c.      Network shall have the right to terminate this Agreement immediately if it determines, in its reasonable discretion, that the health or welfare of Participants is jeopardized by the continuation of the Agreement.  Under such circumstances, Network shall provide written notice to Facility specifying the basis for termination.

3.      **Effect of Termination**  If any Participant remains under Facility's care on the termination date, whether in- or outpatient, Facility shall continue to render appropriate care to such Participant until Facility can arrange for transfer of such care to another provider.  Facility shall make best efforts to transfer such Participants to other Network providers.  Facility shall accept payment from Clients for such post-termination care as if the Agreement had not been terminated.

F.      **MISCELLANEOUS**

1.      **Independent Contractors**  Each party, including its officers, directors, employees and agents, acts as an independent contractor.  Neither party has express or implied authority to assume or create any obligation on behalf of the other.  The parties shall maintain a cooperative relationship in order to effectuate this Agreement.  Each party solely is responsible for its own actions or omissions, and those of its officers, directors, employees and agents, arising in connection with obligations created under this Agreement, including Facility's rendering professional advice and/or treatment.

2.      **Indemnification**  Each party shall hold the other, including its officers, directors, employees, agents, successors and assigns, harmless from and against all claims, liability, damages, and expenses, which may be alleged against or incurred by the other party and are the result of any act or omission of the indemnifying party, or any of its employees and/or agents, in connection with this Agreement.

3.      **Severability and Waiver**  The waiver by either party of any breach of any provision of this Agreement shall not be construed as a waiver of any subsequent breach of the same or any other provision.  The failure to exercise any right hereunder shall not operate as a waiver of such right. The finding by a court of competent jurisdiction that any provision herein is void shall not void any other valid provision of this Agreement.

4. **Confidentiality and Disclosure**

   a. The parties shall comply with all applicable laws and regulations regarding maintenance and disclosure of Participants' medical records.

   b. All confidential information given to Facility by MPI, including the names of Network's Clients, shall be kept confidential and shall not be used except as necessary to implement this Agreement.

   c. Neither party shall disclose the Contract Rates and/or the compensation payable to Facility pursuant to the terms of this Agreement, except as may be required in order to comply with this Agreement, or to the extent required by applicable law. In addition, Network, in its discretion, may release such information to Clients and potential clients as Network may reasonably determine is required in connection with marketing its products.

   d. Network and Clients may include Facility's name, address, telephone number, practice specialties, in its directories of participating providers.

5. **Notices** Any notice required to be given pursuant to this Agreement shall be in writing and delivered by hand, by certified mail/return receipt requested, or by facsimile confirmed with overnight delivery, to the signatories, or their successors if any, at the addresses set forth below.

6. **Modification** This Agreement, together with Appendix A and Exhibit 1, constitute the entire agreement between the parties with respect to the subject matter hereof, and as of the date this Agreement is executed by both parties, shall supersede any previous agreements or understandings, written or oral, between the parties. All modifications of the Agreement shall be in writing and signed by both parties.

7. **Governing Law** This Agreement shall be governed by the laws of the state in which Facility is licensed to operate.

**IN WITNESS HEREOF,** duly authorized representatives of the parties have executed this Agreement.

MultiPlan, Inc.
115 Fifth Avenue
New York, New York 10003-1004
By: _[signature]_  1-16-03
Donald Rubin    Date
Chairman

Facility _North Beach Dialysis_
Principal Address: _11500 NW 2nd Ave, Ste 208_
_N. Miami Beach, FL 33169_
By: _[signature]_
Signature    Date
_Michael Rottman, Exec. V.P._
Print Name and Title of Signatory
Tax I.D. #: _592209927_



# APPENDIX A

## MULTIPLAN, INC.
## PARTICIPATING FACILITY AGREEMENT

**A.  Contract Rates**

   1. For inpatient and outpatient services covered by group health Benefit Programs and rendered to Participants, Facility agrees to accept as payment in full the amounts set forth below:

   ▮ % less than Facility's reasonable and customary charge.

   2. For inpatient and outpatient services covered by Workers' Compensation and No Fault Automobile Liability coverage rendered to Participants Facility agrees to accept as payment in full the following (check one):

   /____/  ____% of the state fee schedule amount, or

   /____/  The same fees as set forth in paragraph A(1) of this Appendix A.

**B.  Licensure**
Facility is licensed in the state of _Florida_

**C.  Medicare Number**  _162558_

**D.  Accreditation**
Facility is accredited by:

   JCAHO_____ accreditation period ending _____

   Other (specify):_____ accreditation period ending _____

**E.  Insurance**
Facility maintains malpractice liability insurance the following amounts:

$ _1,000,000_ per occurrence;   $ _3,000,000_ annual aggregate.

Carrier _Zurich Ins. Co._



# APPENDIX B

## MULTIPLAN, INC.
### PARTICIPATING FACILITY AGREEMENT
### CERTIFICATE OF ACCREDITATION

515



# APPENDIX C

## MULTIPLAN, INC.
## PARTICIPATING FACILITY AGREEMENT
## CERTIFICATE OF INSURANCE

515